## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WA PING KWAN, derivatively on behalf of ARRAY TECHNOLOGIES, INC. f/k/a ATI INTERMEDIATE HOLDINGS, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>JIM FUSARO, NIPUL PATEL, TROY ALSTEAD, ORLANDO D. ASHFORD, FRANK CANNOVA, RON P. CORIO, BRAD FORTH, PETER JONNA, JASON LEE, ATI INVESTMENT PARENT, LLC, OAKTREE ATI INVESTORS, L.P., OAKTREE POWER OPPORTUNITIES FUND IV, L.P., OAKTREE POWER OPPORTUNITIES FUND IV (PARALLEL), L.P., OAKTREE CAPITAL GROUP HOLDINGS, L.P., OAKTREE CAPITAL MANAGEMENT, L.P.,<br><br>    Defendants,<br><br>    and<br><br>ARRAY TECHNOLOGIES, INC.,<br><br>    Nominal Defendant. | Case No.:<br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Array Technologies, Inc. ("Array" or the "Company"), formerly known as ATI Intermediate Holdings, LLC, files this Verified Shareholder Derivative Complaint against Defendants Jim Fusaro, Nipul Patel, Troy Alstead, Orlando D. Ashford, Frank Cannova, Ron P. Corio, Brad Forth, Peter Jonna, Jason Lee, (collectively, the "Individual Defendants"), ATI Investment Parent, LLC, Oaktree ATI Investors, L.P., Oaktree Power Opportunities Fund IV, L.P.,

Oaktree Power Opportunities Fund IV (Parallel), L.P., Oaktree Capital Group Holdings, L.P., and Oaktree Capital Management, L.P. (collectively, the "Oaktree Defendants," and together with the Individual Defendants, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Array, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Array's directors, officers, and controlling shareholders between October 14, 2020, and May 11, 2021, both dates inclusive (the "Relevant Period").

2.      Array is a Delaware corporation based in Albuquerque, New Mexico, that manufactures ground-mounting systems used in solar energy projects. Its principal product is an integrated system of steel supports, electric motors, gearboxes, and electronic controllers commonly referred to as a single-axis "tracker" that moves solar panels throughout the day to maintain an optimal orientation to the sun.

3.      The Company made an initial public offering in October 2020 ("IPO") and made secondary public offerings in December 2020 ("December 2020 SPO") and March 2021 ("March 2021 SPO") (collectively, the "Offerings"). According to documents filed with the SEC, the Defendants offered 47.5 million shares in the IPO at $22.00 per share, 31.88 million shares in the December 2020 SPO at $35.00 per share, and 31.05 million shares in the March 2021 SPO at $28.00 per share.

4.      Beginning October 14, 2020 and throughout the Relevant Period, the Individual Defendants and the Controlling members (collectively, the "Defendants") made, or caused the Company to make, materially false and misleading statements concerning the Company's business, operations, and prospects. Specifically, the Defendants failed to mention issues concerning material negative impacts of rising steel and freight costs on the Company's operations and consistently made materially misleading statements regarding the Company's business and prospects that did not reflect these rising costs.

5.      In reality, increases in the prices of ocean freight, truck freight, and steel had begun having a material impact on the Company's margins and prospects even before the Relevant Period, ultimately causing the Company to fall short of profit expectations.

6.      On May 11, 2021, the Company reported financial results from the first fiscal quarter of 2021 ("Q1" or "Q1 2021"). The results showed massive decreases in revenues and gross profit compared to the corresponding period in 2020. Specifically, the report indicated that revenues had fallen 44% compared to the prior-year period and gross profit had decreased 63% compared to the prior-year period, primarily due to increased steel and freight costs. The report indicated that spot prices of hot rolled coil steel, the primary raw material used in the Company's products, *more than doubled* from the first fiscal quarter 2020 ("Q1 2020") to Q1 2021, and had

continued to increase in the second fiscal quarter of 2021 ("Q2" or "Q2 2021"). Additionally, on an investor call that same evening, Defendant Fusaro revealed that "[t]he average cost to ship a container from Asia to the West Coast has increased by more than 145% from April 2020 to April 2021."

7.     On this news, which was released after markets closed and which contradicted the Company's earlier statements regarding cost management in its supply chain, the Company's share price declined from its May 11, 2021 closing price of $24.95 to close May 12, 2021 at $13.46, a decrease of $11.49, or approximately 46%. As a result, Plaintiff has suffered significant losses and damages.

8.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that touted the Company's ability to keep costs low and failed to disclose, *inter alia*, that: (1) steel prices had been rising significantly since Q1 of 2020; (2) both ocean and truck freight costs had starkly increased since April 2020; (3) the Company failed to maintain adequate internal controls related to disclosures; and (4) the Company's margins and prospects were rapidly declining. As a result of the foregoing, the Company's public statements touting positive metrics, giving optimistic guidance, and attesting to the success of its supply chain management and cost reduction capabilities were materially false and misleading at all relevant times.

9.     The Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material

fact.

10.    Additionally, in breach of their fiduciary duties, the Defendants caused the Company to fail to maintain adequate disclosure controls as is required by SEC regulations and the Company's own Audit Committee Charter, Business Code of Conduct, and Corporate Governance Guidelines.

11.    The Oaktree Defendants and at least four of the Individual Defendants—Corio, Forth, Fusaro, and Patel—breached their fiduciary duties by selling shares at artificially inflated prices in the Offerings, which were artificially inflated due to Defendants' conduct in making and/or causing the Company to make materially false and misleading statements about the Company's costs, margins, and prospects.

12.    In light of the Defendants' misconduct, which has subjected certain of the Defendants to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York, the need to undertake intake internal investigations, the need to implement adequate controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Defendants, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action; of the substantial likelihood of the directors' liability in the Securities Class Action; and of their not being disinterested and/or

independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Array. Plaintiff has continuously held Array common stock at all relevant times.

### Nominal Defendant Array

20.     Array is a Delaware corporation with its principal executive offices at 3901 Midway Place NE, Albuquerque, New Mexico, 87109. Array's shares trade on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ARRY."

**Defendant Fusaro**

21.     Defendant Jim Fusaro ("Fusaro") has been the Company's Chief Executive Officer ('CEO") since June 2018 and is also a member of the Board directors. According to the Company's Schedule 14A filed with the SEC on April 26, 2021 (the "2021 Proxy Statement"), as of March 31, 2021, Defendant Fusaro beneficially owned 182,772 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $29.82, Defendant Fusaro owned approximately $5.45 million worth of Array stock.

22.     For the fiscal year ended December 31, 2020, Defendant Fusaro received $3,107,811 from the Company. This included $519,583 in salary, $424,000 in option awards, $1,340,328 in stock awards, $812,500 in non-equity incentive plan compensation, and $11,400 in all other compensation.

23.     Defendant Fusaro individually sold millions of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Fusaro gained from the three Offerings:

| Offer | Offer Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|
| IPO | $22[1] | 1,963,344 | 1,700,480 | 262,864 | $5,783,008 | 1,644,514 | 318,830 | $7,014,260 |
| Dec. 2020 SPO | $35[2] | 1,644,514 | 1,234,397 | 410,117 | $14,354,095 | 1,198,328 | 446,186 | $15,616,510 |
| Mar. 2021 SPO | $28[3] | 1,151,040 | 978,703 | 172,337 | $4,825,436 | 937,258 | 213,782 | $5,985,896 |

24.     Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Fusaro received $28,616,666 for selling his shares at the Offerings.

25.     The 2021 Proxy Statement stated the following about Defendant Fusaro:

**Jim Fusaro** has been our Chief Executive Officer since June 2018. Mr. Fusaro first began his career in aerospace in 1985. Prior to joining the Company, Mr. Fusaro served as a senior executive for multinational corporations including, Amkor Technology, Honeywell Aerospace, and Honeywell Performance Materials and Technologies, and Avnet. Prior to joining the Company, Mr. Fusaro served as Senior Vice President, IoT and Global Design Solutions of Avnet between June 2017 and June 2018. From June 2011 and June 2016, Mr. Fusaro held a number of leadership positions at Honeywell Aerospace, including Vice President & General Manager of Mechanical Subsystems and Vice President of Honeywell Operating System. From June 2016 and June 2017, Mr. Fusaro served as President of Honeywell Performance Materials, Advanced Materials. Mr. Fusaro holds a Master of Science in Mechanical Engineering from Rensselaer Polytechnic Institute and a Bachelor of Science in Mechanical Engineering from Arizona State University, additionally he is a certified Six Sigma Black Belt. Mr. Fusaro has authored over 60 technical publications and holds a number of U.S. Patents. Mr. Fusaro was nominated to serve on our board of directors because of his extensive senior leadership experience and comprehensive knowledge of our business and

---

[1] An underwriting discount of $1.21 per share applied at the IPO and is not reflected in the illustrative calculations presented in this complaint.
[2] An underwriting discount of $1.05 per share applied at the December 2020 SPO and is not reflected in the illustrative calculations presented in this complaint.
[3] An underwriting discount of $0.77 per share applied at the March 2021 SPO and is not reflected in the illustrative calculations presented in this complaint.

perspective of our day-to-day operations.

**Defendant Patel**

26.     Defendant Nipul Patel ("Patel") has been the Company's Chief Financial Officer ("CFO") since April 2019. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Patel beneficially owned 37,068 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $29.82, Defendant Patel owned approximately $1.1 million worth of Array stock.

27.     Defendant Patel individually sold nearly 300,000 of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Defendant Patel gained from the three Offerings:

| Offer | Offer Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|
| IPO | $22 | 608,342 | 551,239 | 57,103 | $1,256,266 | 539,336 | 69,006 | $1,518,132 |
| Dec. 2020 SPO | $35 | 539,336 | 415,438 | 123,898 | $4,336,430 | 407,923 | 131,413 | $4,599,455 |
| Mar. 2021 SPO | $28 | 396,653 | 386,635 | 10,018 | $280,504 | 377,515 | 19,138 | $535,864 |

28.     Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Patel received $6,653,451 for selling his shares at the Offerings.

29.     The 2021 Proxy Statement stated the following about Defendant Patel:

**Nipul Patel** joined the Company as Chief Financial Officer in April 2019. Prior to joining the Company, Mr. Patel served as Vice President Global Finance—Financial Planning and Analysis of Avnet between 2013 and 2018, as Director of Finance, Marketing and Product Management of Honeywell International between 2007 and

2013, and as Vice President Finance, FP&A and Solutions of Benchmark Electronics between 2018 and 2019. Mr. Patel is a Certified Public Accountant, holds a Bachelor of Science degree in accountancy from Miami University, and earned an MBA from Case Western Reserve University.

**Defendant Alstead**

30.    Defendant Troy Alstead ("Alstead") is a Company director and has been since the

IPO in October 2020.

31.    Defendant Alstead received compensation due to his membership on the Board for

the year ended December 31, 2020. Specifically, he received $118,016, which included $18,016

in fees earned or paid in cash and stock awards of $100,000.

32.    The 2021 Proxy Statement stated the following about Defendant Alstead:

**Troy Alstead** is the founder of Ocean5 and Table 47, concepts opened in 2017 for dining, entertainment and events. In February 2016, Mr. Alstead retired from Starbucks Corporation, an American coffee company and coffeehouse chain, after 24 years with the company, having most recently served as Chief Operating Officer. Mr. Alstead served as Chief Operating Officer beginning in 2014. From 2008 to 2014, Mr. Alstead served as that company's Chief Financial Officer and Chief Administrative Officer. Additionally, Mr. Alstead served as Group President from 2013 until his promotion to Chief Operating Officer. Mr. Alstead joined Starbucks in 1992 and over the years served in a number of operational, general management, and finance roles. Mr. Alstead spent a decade in Starbucks' international business, including roles as Senior Leader of Starbucks International, President Europe/Middle East/Africa headquartered in Amsterdam, and Chief Operating Officer of Starbucks Greater China, headquartered in Shanghai. Mr. Alstead is also a member of the board of directors of Levi Strauss & Co. and Harley-Davidson, Inc., OYO Global, and Topgolf International. Mr. Alstead earned a B.A. in business administration from the University of Washington. Mr. Alstead was nominated to serve on our board of directors because of his expertise in the areas of finance and operations.

**Defendant Ashford**

33.    Defendant Orlando D. Ashford ("Ashford") is a Company director and has been

since the IPO in October 2020.

34.     Defendant Ashford received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $118,016, which included $18,016 in fees earned or paid in cash and stock awards of $100,000.

35.     The 2021 Proxy Statement stated the following about Defendant Ashford:

**Orlando D. Ashford** served as the President at Holland America Line Inc. at Carnival plc from December 2014 until June 2020. Mr. Ashford oversaw Holland America Line's sales and marketing, revenue management deployment and itinerary planning, public relations, hotel operations and strategy. Between 2012 and 2014, Mr. Ashford was the President of the Talent business segment at Mercer LLC and Mercer Inc., a global consulting leader and subsidiary of Marsh & McLennan Companies. From 2008 to 2012, Mr. Ashford was the Senior Vice President, Chief Human Resources and Communications Officer for Marsh & McLennan Companies, Inc. Prior to joining Marsh & McLennan Companies, Inc. in 2008, Mr. Ashford served as Group Director of Human Resources for Eurasia and Africa for the Coca-Cola Company and as Vice President of Global Human Resources Strategy and Organizational Development for Motorola, Inc. Mr. Ashford has also held leadership positions with Mercer Delta Consulting, Ameritech and Andersen Consulting. Mr. Ashford serves on the board of directors for ITT Inc., Hershey Entertainment & Resorts Company, the Virginia Mason Medical Center, the Seattle chapter of the Positive Coaching Alliance and Year Up. Mr. Ashford has been honored as a Purdue University School of Technology Distinguished Alumnus and received the Seattle Business Magazine 2019 Executive Excellence Award. Mr. Ashford earned a Bachelor of Science degree and Master of Science degree in Organizational Leadership and Industrial Technology from Purdue University. Mr. Ashford was nominated to serve on our board of directors because of his extensive experience serving on public company boards and his expertise in addressing talent, culture and human capital issues at the executive level.

**Defendant Cannova**

36.     Defendant Cannova is a Company director and has been since the IPO in October 2020. Defendant Cannova is a Vice President at Oaktree Capital Management, L.P., which is the investment manager of three defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Defendant Cannova disclaims beneficial ownership of the shares of common stock that are beneficially owned by Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities

Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Current and former executives and employees of Oaktree Capital Management, L.P., such as Defendant Cannova, hold their interests in Array through Oaktree Capital Group Holdings, L.P.

37.     Defendant Cannova received compensation from the Company due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $14,837 in fees earned or paid in cash.

38.     The 2021 Proxy Statement stated the following about Defendant Cannova:

**Frank Cannova** is a vice president at Oaktree, where he is responsible for sourcing, executing and overseeing investments in leading companies in the energy, utility and industrials sectors for the Power Opportunities investment strategy at Oaktree. Mr. Cannova currently serves on the boards of Array Technologies, Renewable Energy Infrastructure Group, and Shoals Technologies Group Inc., a privately held manufacturing company. Mr. Cannova previously served on the board of directors of Contract Land Staff. Prior to joining Oaktree in 2015, Mr. Cannova was an associate in the private equity group of Sun Capital Partners, responsible for evaluating investments across the consumer, business services and industrial sectors. Mr. Cannova began his career as an investment banking analyst with Imperial Capital providing M&A and leveraged finance advisory services. Mr. Cannova received a B.S. degree in chemical engineering from University of California, Los Angeles. Mr. Cannova was nominated to serve on our board of directors because of his expertise in the areas of finance and energy.

### Defendant Corio

39.     Defendant Ron P. Corio ("Corio") is the founder of Array Technologies. He is a Company director and has been since the IPO in October 2020, at least.

40.     Defendant Corio received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $13,777 in fees earned or paid in cash.

41.     Defendant Corio individually sold approximately 45.5 million of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Defendant Corio gained from the three Offerings:

| Offer | Offer Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|
| IPO | $22 | 45,493,187 | 25,050,496 | 20,442,691 | $449,739,202 | 22,816,932 | 22,676,255 | $498,877,610 |
| Dec. 2020 SPO | $35 | 22,816,932 | 12,685,929 | 10,131,003 | $354,585,105 | 11,188,080 | 11,628,852 | $407,009,820 |
| Mar. 2021 SPO | $28 | 11,188,080 | 1,394,860 | 9,793,220 | $274,210,160 | 0 | 11,188,080 | $313,266,240 |

42.     Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Corio received $1,219,153,670 for selling his shares at the Offerings.

43.     The 2021 Proxy Statement stated the following about Defendant Corio:

**Ron P. Corio** founded Array Technologies in 1989. Mr. Corio served as Chief Executive Officer and Chief Technical Officer of the Company from January 1989 to June 2018. Mr. Corio is also the inventor of 13 patents. Mr. Corio was nominated to serve on our board of directors because of his extensive solar energy experience, technical expertise and long history with the Company.

**Defendant Forth**

44.     Defendant Brad Forth ("Forth") is Chairman of the Company's Board and has been since the IPO in October 2020. According to the 2021 Proxy Statement, as of March 31, 2021, Defendant Forth beneficially owned 60,924 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $29.82, Defendant Forth owned approximately $1.82 million worth of Array stock as of that date.

45.     Defendant Forth received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received over $484,000, which included $37,622 in fees earned or paid in cash and $446,776 in stock awards.

13

46.     Defendant Forth individually sold approximately 45.5 million of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Defendant Corio gained from the three Offerings:

| Offer | Offering Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|
| IPO | $22 | 2,610,480 | 1,834,500 | 775,980 | $17,071,560 | 1,678,185 | 932,295 | $20,510,490 |
| Dec. 2020 SPO | $35 | 1,678,185 | 967,033 | 711,152 | $24,890,320 | 862,445 | 815,740 | $28,550,900 |
| Mar. 2021 SPO | $28 | 862,445 | 182,943 | 679,502 | $19,026,056 | 81,232 | 781,213 | $21,873,964 |

47.     Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Forth received $70,935,354 for selling his shares at the Offerings.

48.     The 2021 Proxy Statement stated the following about Defendant Forth:

**Brad Forth** has been a senior advisor to Oaktree's GFI Energy Group since 2016. Mr. Forth helps the team anticipate growth opportunities in the power, utility and energy sectors, and invest its capital in leading companies, helping management teams to accelerate the growth of their businesses. Mr. Forth has spent his entire career in the energy industry. Mr. Forth began his career as a design engineer at Power Measurement, Inc. in 1988, where he was responsible for pioneering research in the field of digital power metering and energy management systems. Mr. Forth remained at Power Measurement in various capacities for 18 years, the last nine as its Chief Executive Officer from 1999 to 2005. In 2006, Mr. Forth joined GFI Energy Group as a partner until 2009. Mr. Forth was a Managing Director at Oaktree from 2009 to 2016. Mr. Forth was a former board member of Xantrex Technology, The Kirlin Group and OpTerra Energy Group, and a former board chair of GT Solar Incorporated, Turbine Generator Maintenance, Cannon Technologies, GoodCents and TenK Solar. Since June 2017, Mr. Forth has been a board member of Shoals Technologies Group Inc., a privately held manufacturing company. Mr. Forth received a Bachelor of Electrical Engineering degree from the University of Victoria in Canada. Mr. Forth was winner of the 2002 Ernst and Young award for "Pacific Entrepreneur of the Year—Technology and

Communications" and has been a member of Young Presidents' Organization since 1998. Mr. Forth was nominated to serve as the chairman of our board of directors because of his expertise in the energy industry.

**Defendant Jonna**

49.     Defendant Peter Jonna ("Jonna") was a director of the Company during the Relevant Period, but left the Board effective May 10, 2021 and was replaced by non-party Jayanthi "Jay" Iyengar. Defendant Jonna is a Managing Director at Oaktree Capital Management, L.P., which is the investment manager of three defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Defendant Jonna disclaims beneficial ownership of the shares of common stock that are beneficially owned by Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Current and former executives and employees of Oaktree Capital Management, L.P., such as Defendant Jonna, hold their interests in Array through Oaktree Capital Group Holdings, L.P.

50.     Defendant Jonna received compensation due to his membership on the Board of Directors for the year ended December 31, 2020. Specifically, he received $13,777 in fees earned or paid in cash.

51.     The 2021 Proxy Statement stated the following about Defendant Jonna:

**Peter Jonna** has worked in Oaktree's GFI Energy Group since 2013, where he is responsible for sourcing, executing and overseeing investments in leading companies in the energy, utility and industrials sectors. Mr. Jonna has been a managing director at Oaktree since January 2020. Mr. Jonna's prior positions include serving as a senior vice president from July 2017 to January 2020 and as a Vice President from July 2015 to July 2017. Mr. Jonna presently serves on the boards of directors of: Building Infrastructure Solutions Group, a privately held building services company; Shoals Technologies Group Inc., a privately held manufacturing company; Renewable Energy Infrastructure Group, a privately held renewable energy services company; Montrose Environmental Group, Inc., a publicly held environmental services company; and Infrastructure & Energy Alternatives, Inc., a publicly held infrastructure construction company. Mr. Jonna

previously served on the board of directors of Sterling Lumber Company. Prior to joining Oaktree, Mr. Jonna was an investment analyst in the Americas investment team of the UBS Infrastructure Asset Management strategy, investing directly in energy, power and transportation infrastructure assets. Mr. Jonna began his career as a project development engineer in Skanska's Large Projects Group which focused on developing and constructing public private partnerships and infrastructure development projects. Mr. Jonna earned an M.S. in civil engineering from Stanford University and a B.S. in civil engineering from University of California, Los Angeles. Mr. Jonna was nominated to serve on our board of directors because of his expertise in the energy, utility and industrials sectors.

**Defendant Lee**

52.     Defendant Jason Lee ("Lee") is a Company director and has been since the IPO in October 2020. Defendant Lee is a Managing Director and Co-Portfolio Manager at Oaktree Capital Management, L.P., which is the investment manager of three defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Defendant Lee disclaims beneficial ownership of the shares of common stock that are beneficially owned by Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Current and former executives and employees of Oaktree Capital Management, L.P., such as Defendant Lee, hold their interests in Array through Oaktree Capital Group Holdings, L.P.

53.     Defendant Lee received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $14,307 in fees earned or paid in cash.

54.     The 2021 Proxy Statement stated the following about Defendant Lee:

**Jason Lee** is a managing director and co-portfolio manager at Oaktree where he is responsible for managing the Power Opportunities investment strategy, focused on private equity investments in leading companies serving the energy and utility sectors. Mr. Lee is responsible for the overall management of the group and its investing activities, including setting investment strategy, sourcing and executing investment opportunities and board oversight of the group's portfolio companies. Mr. Lee has worked at Oaktree since 2009. Mr. Lee currently serves on the boards of NAPEC and Shoals Technologies Group Inc., a privately held manufacturing company. Prior to Oaktree, Mr. Lee worked for a number of years as an executive

in the operational management of several companies, some of which he co-founded, and has advised a number of companies and government organizations in the areas of entrepreneurial strategy, investments and finance. Mr. Lee began his career at J.P. Morgan's technology, media and telecom investment banking practice. Mr. Lee received his B.S. degree from the University of California, Berkeley and an M.B.A. from the UCLA Anderson School of Management where he serves as a member of the finance faculty and teaches courses on corporate finance, entrepreneurship and private equity. Mr. Lee was nominated to serve on our board of directors because of his expertise in the areas of finance and energy.

**Defendant ATI Investment Parent, LLC**

55.     ATI Investment Parent, LLC held 100% of the common stock of ATI Intermediate Holdings, LLC at the time of the Company's October 2020 initial public offering. Together, defendants Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P., were at that time co-controlling members of ATI Investment Parent, LLC.

56.     According to an amended S-1 registration statement filed on October 13, 2020:

Oaktree Power Opportunities Fund IV (Delaware) Holdings, L.P. ("Oaktree Power"), Oaktree ATI Investors, L.P. ("Oaktree Investors" and, together with Oaktree Power, "Oaktree") and Ron P. Corio, our founder, currently beneficially own a majority of our common stock through ATI Investment Parent, LLC ("Parent"), which currently owns 100% of our common stock. Following this offering, Oaktree and Ron P. Corio will beneficially own shares of our common stock, which will represent approximately 65% of our total outstanding shares of common stock. Upon completion of this offering, we will be a "controlled company" as defined under the corporate governance rules of Nasdaq. See "Management—Controlled Company Exemption" and "Principal and Selling Stockholders."

57.     ATI Investment Parent, LLC disposed of 47,625,000 shares in the IPO, 36,656,250 shares in the December 2020 SPO, and 35,475,457 shares in the March 2021 SPO.

**Defendant Oaktree ATI Investors, L.P.**

58.     Defendant Oaktree ATI Investors, L.P., together with Oaktree Power Opportunities Fund IV, L.P. and Oaktree Power Opportunities Fund IV (Parallel), L.P., was at all relevant times

a co-controlling member of ATI Investment Parent, LLC. Oaktree ATI Investors, L.P. is managed by investment manager Oaktree Capital Management, L.P.

### Defendant Oaktree Power Opportunities Fund IV, L.P.

59.     Defendant Oaktree Power Opportunities Fund IV, L.P., together with Oaktree ATI Investors, L.P. and Oaktree Power Opportunities Fund IV (Parallel), L.P., was at all relevant times a co-controlling member of ATI Investment Parent, LLC. Oaktree Power Opportunities Fund IV, L.P. is managed by investment manager Oaktree Capital Management., L.P.

### Defendant Oaktree Power Opportunities Fund IV (Parallel), L.P.

60.     Defendant Oaktree Power Opportunities Fund IV (Parallel), L.P., together with Oaktree Power Opportunities Fund IV, L.P. and Oaktree ATI Investors, L.P., was at all relevant times a co-controlling member of ATI Investment Parent, LLC. Oaktree Power Opportunities Fund (Parallel), L.P. is managed by investment manager Oaktree Capital Management, L.P.

### Defendant Oaktree Capital Group Holdings, L.P.

61.     Oaktree Capital Group Holdings, L.P. is the entity in which current and former executives and employees of Oaktree Capital Management, L.P. hold relevant ownership interests.

62.     According to a Schedule 13G form filed with the SEC on February 16, 2021, Oaktree Capital Group Holdings, L.P. owns approximately 38.2% of the business of Oaktree Capital Management, L.P., which is the investment manager of three of the defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P.

### DEFENDANTS' FIDUCIARY DUTIES

63.     By reason of their positions as officers, directors, controlling shareholders, and/or fiduciaries of Array and because of their ability to control the business and corporate affairs of Array, the Individual Defendants and the Oaktree Defendants owed Array and its shareholders

fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Array in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interests of Array and its shareholders so as to benefit all shareholders equally.

64.     Each controlling shareholder, director and officer of the Company owes to Array and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.     The Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of Array, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.     To discharge their duties, the officers, directors, and controlling shareholders of Array were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.     Each Defendant, by virtue of being a director, officer, or controlling shareholder, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of those obligations, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and

directors of the Company has been ratified by the remaining Individual Defendants who comprised a majority of Array's Board at all relevant times.

68.     As senior executive officers, directors, and/or controlling shareholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

69.     To discharge their duties, the officers and directors of Array were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Array were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Mexico, and the United States, and pursuant to Array's own Corporate Governance Guidelines and Code of Business Conduct (the "Code");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock;

   (c) remain informed as to how the Company Array conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

   (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

   (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

   (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

   (g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

   (h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Defendants were the agents of each other and of Array and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, directorial, and controlling positions with Array, each of the Defendants had access to adverse, nonpublic information about the Company.

73.     The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Array.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. In their roles as officers, directors, and/or controlling shareholders of the Company, the Defendants caused the Company to conceal the true facts as alleged herein. The Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse

information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

76.     The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Array was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants, and was at all times acting within the course and scope of such agency.

## ARRAY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Array's Code of Business Conduct*

79.     The Company's Code, current as of October 2020, states that it "applies to all employees, officers, and directors of Array."

80.     In a section titled "Avoiding Conflicts of Interest," the Code states:

As part of our duty to uphold our Company's reputation, we must avoid improper conflicts of interest. A "conflict of interest" occurs when our personal interests interfere with, or appear to interfere with, our ability to perform our jobs without bias. We may not engage in any transaction, investment or association in which a conflict of interest might arise. If you have a potential or actual conflict of interest, you must disclose it to your supervisor or the General Counsel and seek prior authorization or approval from the General Counsel.

81.    In a section titled "Improper Personal Benefits," the Code states:

A conflict of interest may also arise when a director, officer or employee, or a member of his or her immediate family, receives improper personal benefits because of his or her position at Array. Such benefits may include gifts or loans from an entity or person with whom our Company does business. We must avoid accepting any such improper benefit.

82.    In a section titled "Disclosure," the Code states:

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules. … Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:
> 1. be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and
> 2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

### *Corporate Governance Guidelines*

83.    The Company's Board has adopted Corporate Governance Guidelines. The

Corporate Governance Guidelines state that the Board's responsibilities include:

<u>Reporting and Compliance Systems</u>. To ensure that Company management maintains an effective system for timely reporting to the Board or appropriate Board committees and to the public as required on the following: (1) the Company's financial and business plans, strategies and objectives; (2) the financial results and condition of the Company and its business segments; (3) significant accounting, regulatory, competitive, litigation and other external issues affecting the Company;

and (4) systems of control which promote accurate and timely reporting of financial information to stockholders and compliance with laws and corporate policies.

84. The Corporate Governance Guidelines state that the Board's responsibilities include disclosure of relationships:

> Disclose Relationships. To disclose promptly to the Board any existing or proposed relationships with the Company (other than service as a Board member or on Board committees) which could be required to be disclosed or could affect the independence of the director under applicable listing standards, including direct relationships between the Company and the director and his or her family members, and indirect relationships between the Company and any business, nonprofit or other organization in which the director is a general partner or manager, officer, or significant stockholder, or is materially financially interested.

85. The "Director Criteria" that the Board considers pursuant to the Corporate Governance Guidelines includes:

> *Conflicts of Interest*. Each director should not, by reason of any other position, activity or relationship, be subject to any conflict of interest that would impair the director's ability to fulfill the responsibilities of a member of the Board.

86. Additionally, the "Director Criteria" the Board considers pursuant to the Corporate Governance Guidelines includes:

> *Independence*. The Board will consider whether directors and nominees will be considered independent under the standards of the NASDAQ, and the heightened independence standards for audit committees and compensation committee under the securities laws.

### *Audit Committee Charter*

87. The Audit Committee Charter states that: "The purpose of the Audit Committee is to oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements."

88. One of the Audit Committee's responsibilities involves earnings releases. The Audit Committee Charter states the following with respect to that responsibility:

> Earnings Releases: To review and discuss with management and the Company's independent auditor: (1) the Company's earnings press releases, including the type

of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information; and (2) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

89.     The Audit Committee Charter also charges the Audit Committee with monitoring compliance with the Code. It states that the Audit Committee's responsibility with respect to the Code is "[t]o monitor compliance with the Company's Code of Conduct (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code."

### *__The Defendants Violated Array's Corporate Governance Documents by Engaging in a Scheme to Issue False and Misleading Statements to the Public__*

90.     The Defendants violated the Code, the Corporate Governance Guidelines, and the Audit Committee Charter by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings and by facilitating and disguising Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Moreover, four of the Individual Defendants and all of the Oaktree Defendants violated the Code of Conduct by selling Company shares at inflated prices for aggregate proceeds in excess of $1 billion dollars. Further, in violation of the Code and the Audit Committee Charter, the Individual Defendants failed to maintain disclosure controls, failed to maintain the accuracy of Company records and reports, and failed to comply with laws and regulations.

## DEFENDANTS' MISCONDUCT

### Background

91.     Array is a Delaware corporation based in Albuquerque, New Mexico, that manufactures ground-mounting systems used in solar energy projects. Its principal product is an integrated system of steel supports, electric motors, gearboxes, and electronic controllers commonly referred to as a single-axis "tracker" that moves solar panels throughout the day to maintain an optimal orientation to the sun.

92.     The Company went public via an IPO in October 2020, and since that time its shares have traded on the NASDAQ and it has been subject to SEC reporting requirements. The Company made two subsequent public offerings in December 2020 and March 2021.  In conjunction with the three Offerings, the Company and its officers made numerous false and misleading statements that resulted in an artificially inflated share price, benefitting the Defendants.

### False and Misleading Statements

#### The IPO Documents

93.     In September 2020, the Company filed a registration statement on Form S-1 in anticipation of an IPO. The Company subsequently amended the S-1 multiple times, and the SEC declared the S-1 effective on October 14, 2020 (the "Registration Statement"). Array also issued a Prospectus pursuant to Rule 424(b)(4) (together with the Registration Statement, the "IPO Documents").

94.     The IPO Documents stated that one of the Company's "Strengths" was its "Demonstrated ability to reduce the cost of our products while increasing profit margins." This claim was bolstered as follows:

> In order to enhance the competitiveness of our products and increase our margins, ***we continually work to reduce the cost of our products through innovation and rigorous supply chain management.*** These efforts have resulted in a reduction in

cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, while simultaneously increasing gross profits and gross margins.

(Emphasis added.)

95.     The IPO Documents claimed that the Company had "[r]igorous supply chain management supported by a sophisticated enterprise resource planning ("ERP") system":

We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. *To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.*

(Emphasis added.)

96.     The IPO Documents also noted that a key element of the Company's strategy was "[l]everaging our global supply chain and economies of scale to reduce product cost":

Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

97.     The IPO Documents did not disclose that Array was unable to reduce the cost of its products through rigorous supply chain management. In fact, steel and freight prices had risen substantially in 2020 before the time of the IPO. Thus, the statements in the IPO Documents touting and attesting to the success of Array's supply chain management and cost reduction capabilities were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

***November 2020 Investor Call***

98.      Array held a conference call with analysts on November 6, 2020 to discuss Q3

2020 financial results. In that call, Defendant Patel stated:

> Gross margins in the third quarter were lower than the prior year period as a result of having less revenue to absorb fixed costs as well as higher logistics costs, largely driven by the global shipping constraints due to COVID-19.

> Importantly, we view both of these dynamics as short term in nature and not indicative of longer-term margin pressure. Operating expenses were roughly flat compared to prior period, excluding professional fees related to our IPO and change for contingent consideration, reflecting tight controls on expenses.

> ….

> The chart for the contingent consideration relates primarily to an earn-out obligation we have with our founder in connection with his sale of the company to Oaktree in 2016. Adjusted EBITDA, which excludes the impact of the earn-out obligations, the IPO expenses and approximately $1 million of other nonrecurring and noncash costs, was $16.6 million for the third quarter, which exceeded our plan by a double-digit margin. Now turning to our 9-month results.

> ***Revenues for the nine months ended September 30, 2020, increased 64% to $692.1 million compared to $423.2 million for the prior year period, driven by increases in the volume of trackers delivered. Gross profits increased 86% to $167.3 million compared to $90.2 million in the prior year period, driven primarily by higher revenues.***

> ***Gross margins increased 24.2% from 21.3% in the prior year period, driven by reductions in purchase materials resulting from improved supplier arrangements and shifting volumes for certain components to new lower-cost suppliers and greater leverage of fixed costs against higher sales volumes.***

> ….

> We decided to provide guidance for the full-year 2020 to give our new public investors additional insight into our outlook for the remainder of the year. Going forward, we will be providing annual guidance as part of our fourth quarter and full year earnings announcements. We will not be providing quarterly guidance in future periods.

> For the full-year 2020 ending December 31, 2020, we expect revenues to be in the range of $845 million to $865 million, adjusted EBITDA to be in the range of $156 million to $160 million, adjusted net income per share to be in the range of $0.82

to \$0.86. This assumes diluted shares outstanding for the three months ending December 31, 2020, of 126,123,723 shares and diluted shares outstanding for the 12 months ending December 31, 2020, of 121,535,154.

Our guidance excludes the impact of any onetime charges, expenses related to the recapitalization and IPO, income or expense related to contingent consideration as well as any related tax impacts.

(Emphasis added.)

99.     In the same call, Defendant Fusaro stated:

Solar with single-access trackers has proven to be one of the cleanest and lowest cost forms of generation, and we see demand for trackers growing faster than the overall market for solar as customers convert from fixed tilt. Moreover, customers are increasingly recognizing the superior reliability and durability of our tracking system, and that is leading to market share gains for our products. ***These factors, combined with our strong order book, give us confidence that we are very well positioned to have another year of substantial growth in 2021.***

(Emphasis added.)

100.    Defendant Fusaro's and Defendant Patel's statements touted positive metrics while underplaying the significance of increases in shipping costs and failing to disclose significant increases in steel prices. Thus, the statements made in the November 2020 investor call were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

### *December 2020 SPO Documents*

101.    In anticipation of a secondary public offering ("SPO"), the Company filed an S-1 registration statement on November 30, 2020, which was later amended, and a prospectus pursuant to Rule 424(b)(4) on December 4, 2020 (collectively, the "December 2020 SPO Documents").

102.    The December 2020 SPO Documents reiterated misleading or false statements made in the IPO Documents.

103.    The December 2020 SPO Documents stated that one of the Company's "Strengths"

was its "[d]emonstrated ability to reduce the cost of our products while increasing profit margins."

This claim was bolstered as follows:

> In order to enhance the competitiveness of our products and increase our margins, ***we continually work to reduce the cost of our products through innovation and rigorous supply chain management.*** These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, while simultaneously increasing gross profits and gross margins.

(Emphasis added.)

104.    The December 2020 SPO Documents claimed that the Company had "[r]igorous

supply chain management supported by a sophisticated ERP system":

> We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. ***To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.***

(Emphasis added.)

105.    The December 2020 SPO Documents reiterated statements in the IPO reflecting

that a key element of the Company's strategy is "[l]everaging our global supply chain and

economies of scale to reduce product cost":

> Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

106.    The December 2020 SPO Documents did not disclose that Array was unable to

reduce the cost of its products through rigorous supply chain management. In fact, steel and freight prices had risen substantially in 2020 before the time of the December 2020 SPO. Thus, the statements in the December 2020 SPO Documents touting and attesting to the success of Array's supply chain management and cost reduction capabilities were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

**The March 2021 Investor Call**

107.    Array held a conference call with analysts on March 9, 2021 to discuss Q4 2020 financial results. In that call, Defendant Fusaro stated:

> In the US market, we are continuing to grow our wallet share with existing customers as well as convert new customers to Array as demonstrated by our strong order book. During 2020, we added 38 new customers underscoring our ability to convert new accounts to Array products. Outside of the US, we are in the process of building the sales and supply chain and fulfillment infrastructure we need to service international customers. COVID-19 has slowed some of our plans that we expect to be able to accelerate our international strategy later this year as travel restrictions and other challenges created by the pandemic abate.

108.    In the same call, Defendant Patel implied that rising costs were not a concern because the Company had taken a "conservative approach" to its guidance:

> First, as [Fusaro] discussed earlier, we have made product innovation a priority and we are investing in it. In addition to the research center he discussed, we will be adding additional engineering resources and investing more in R&D. These investments have a near-term cost as we will be making the investments ahead of the incremental revenues that we expect to generate from new products. But the long-term results should be higher revenues, greater market share and increased margins. Second, we are investing in the sales, supply chain and fulfillment infrastructure we need to service our international customers. The more to our investments in new product development, we have a short-term mismatch between the cost of our investment and the revenues that they will yield. Third, our 2021 SG&A reflects additional public company costs, which will represent a year-over-year headwind for us. ***And finally, commodity prices and freight costs have increased significantly over the past several months as a result of the re-acceleration of the global economy while certain transportation and raw material capacity remains offline as a result of the pandemic. While we expect prices to normalize and our contracts allow us to pass on these costs to our customers, we have taken a conservative approach to our guidance by making these cost into***

*the low end of our guidance assuming a delayed return to more normalized pricing.*

I'd like to close by providing some key modeling assumptions for the full year 2021. As I mentioned earlier, the two-year push out of the ITC step down has impacted how customers time their orders. As a result, we will see a different quarterly distribution of revenues and earnings in 2021 than we did in 2020. We currently expect to generate 20% to 25% of our annual revenues in Q1, 25% to 30% in Q2, 25% to 30% in Q3, and 20% to 25% in Q4. We expect interest expense to be between $26 million to $28 million. Diluted weighted average share count for 2021 to be $127.5 million shares, and our effective tax rate to be 25%.

(Emphasis added.)

109.    At least five analyst questions in the March 9, 2021 conference call sought to

uncover the impact of freight and steel costs on the Company's margins. One analyst asked:

It wasn't clear to me as the impacts of these investments and other expenses during the year; how it's distributed across gross versus EBIT margins? So it sounded like it was more below the line, below operating expense related than it was direct costs. Can you just sort of give us some sense there?

110.    Defendant Patel responded:

So on the other – on the margin side, we built into our range. The impact of higher freight and raw material costs really not abating as quickly and that's really the other half of that cost that we have in our guidance range, Paul.

111.    Another analyst asked, "is the cost of steel becoming a problem for you, world steel

[sic]?" Defendant Fusaro responded by characterizing steel, the Company's most crucial input, as

having no greater importance than any other commodities.  He stated, ***"we obviously manage and***

***monitor all commodities accordingly, and then we build in productivity measures to address that***

***to continue to drive our value."*** (Emphasis added.) He then continued, dismissing concerns over

rising costs on the basis that rising costs are routine and proceeding to tout the Company's supply

chain management:

*I mean, there is always going to be pressure on cost.* That's pretty much market-agnostic and product-agnostic. But that said, we've actually built up, we continue to build out our supply chain. We added 15 new suppliers in four new countries. So

that's just going to be an area that we remain focused on going forward as we grow both domestic here and internationally.

(Emphasis added.)

112.    Another analyst asked about material costs: "a little bit back to the question around input costs and supply chain. Are you guys looking at any new materials that could potentially reduce your cost of goods sold?" Defendant Fusaro responded by indicating he did not wish to talk about methods for lowering input costs: "Yes. Now, don't ask what they are."

113.    Another analyst asked:

So just a bit [sic], you're talking about the first half of the year fully booked based on the backlog and when would you be buying that steel just as it's been moving quite a bit? So have you locked in the steel as you locked in that pricing, so you have high visibility into the margins or not necessarily so?

114.    Defendant Patel responded:

Yes. So we typically – I'll just give you our typical order patterns. We typically order material between six and 12 weeks from the date of the shipment. So we keep very low inventory. So the impact obviously, if the COGS, the recent run up prices would impact second half more than it would first half.

115.    Another analyst asked:

So in the guidance, you highlight your expectation that commodity prices and freight charges to normalize over time. Just curious what drives that normalization view and then how long it would take – how long the cost would need to remain elevated before you seriously decided are considered passing it on to customers, and then *how to think about any concerns surrounding implications to demand from customers from higher costs?*

(Emphasis added.)

116.    Instead of addressing the analyst's concern regarding the implications to customer demand of higher costs, Defendant Patel responded by asserting that rising input costs could be dealt with on a "case by case basis":

So as far as that first part of the question, as far as how long we think it is and obviously, it's unknown, it's – we're on unprecedented times as far as the

commodity prices increasing. And it's really just – it's a lot of the – as the economy begins to reopen, there is a lot of pre-pandemic capacity that still remains idle. So we are thinking second half and late second half is when it's coming back online. ***And as far as your second half of the question, we're always evaluating all our pricing on our projects and we know that we have that ability and we'll look at it on a case by case basis, so.***

(Emphasis added.)

117.    The statements made in the March 2021 investor call were materially false and misleading because, *inter alia*, they: (1) treated significant and abnormal increases in steel and freight costs as everyday occurrences within the Company's control, (2) rejected calls to discuss the Companies' strategies for dealing with rising costs, preventing full disclosure of the problem, and (3) concealed the gravity of the increases in steel and freight prices by indicating that case-by-case solutions would be sufficient. Additionally, Defendants Fusaro and Patel failed to disclose material facts necessary to make their statements in the March 2021 investor call not false and misleading.

***The March 2021 SPO Documents***

118.    In anticipation of a March 2021 SPO, the Company filed a registration statement on March 16, 2021 and a prospectus pursuant to Rule 424(b)(4) on March 22, 2021 (collectively, "March 2021 SPO Documents"). The March 2021 SPO Documents reiterated false or misleading statements present in the IPO Documents and the December 2020 SPO Documents.

119.    The March 2021 SPO Documents stated that one of the Company's "Strengths" was its "[d]emonstrated ability to reduce the cost of our products while maintaining profit margins":

> In order to enhance the competitiveness of our products and increase our margins, ***we continually work to reduce the cost of our products through innovation and rigorous supply chain management.*** These efforts have resulted in a reduction in cost of goods sold per watt by approximately 22% from 2017 through 2020. This has allowed us to reduce average selling prices by approximately 22% over the

same period, driving significant increases in revenues, while simultaneously increasing gross profit and maintaining gross margin.

(Emphasis added.)

120.   The March 2021 SPO Documents also contended that the Company had "[r]igorous supply chain management supported by a sophisticated enterprise resource planning ("ERP") system," stating as follows:

> We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. ***To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.***

(Emphasis added.)

121.   The March 2021 SPO Documents stated that one key element of the Company's strategy is "Leveraging our global supply chain and economies of scale to reduce product cost":

> Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

122.   The March 2021 SPO Documents did not disclose that Array was unable to reduce the cost of its products through rigorous supply chain management. In fact, steel and freight prices had risen substantially in 2020 and in 2021 before the time of the March 2021 SPO. Thus, the statements in the March 2021 SPO Documents touting and attesting to the success of Array's supply chain management and cost reduction capabilities were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

*The 2021 Proxy Statement*

123.     On April 26, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

124.     The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Alstead and Ashford to the Board for a three-year term; and (2) ratify the selection of BDO USA, LLP ("BDO") as the independent registered public accounting firm for the Company for the fiscal year ending December 31, 2021.

125.     The 2021 Proxy Statement stated the following regarding the Board's, and each Board committee's, risk oversight functions:

> The Board of Directors plays an important role in risk oversight at Array through direct decision-making authority with respect to significant matters, as well as through the oversight of management by the Board of Directors and its committees. In particular, the Board of Directors administers its risk oversight function through (1) the review and discussion of regular periodic reports by the Board of Directors and its committees on topics relating to the risks that Array faces, (2) the required approval by the Board of Directors (or a committee of the Board of Directors) of significant transactions and other decisions, (3) ***the direct oversight of specific areas of Array's business by the Audit, Compensation and Nominating and Corporate Governance Committees***, and (4) ***regular periodic reports from the auditors and other outside consultants regarding various areas of potential risk, including, among others, those relating to our internal control over financial reporting***. The Board of Directors also relies on management to bring significant matters impacting Array to the attention of the Board of Directors.

(Emphasis added.)

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

126.    The 2021 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time included Defendants Alstead, Ashford, and Lee. These responsibilities included, "reviewing and discussing with management and Array's independent registered public accounting firm, Array's system of internal controls, its critical accounting practices, and policies relating to risk assessment and management," through which *"the Audit Committee discusses Array's major financial risk exposures and steps that management has taken to monitor and control such exposure."* (Emphasis added.)

127.    The 2021 Proxy Statement was materially misleading because it failed to disclose, *inter alia*, that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Board committees' responsibilities, the Board and its committees, and in particular the Audit Committee, were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements, and thus the Defendants were breaching their fiduciary duties.

128.    The 2021 Proxy Statement also failed to disclose, *inter alia*, that: (1) steel prices had been rising significantly since Q1 of 2020; (2) both ocean and truck freight costs had starkly increased since April 2020; (3) the Company failed to maintain adequate internal controls related to disclosures; and (4) the Company's margins and prospects were rapidly declining. As a result of the foregoing, the Company's public statements touting positive metrics, giving optimistic guidance, and attesting to the success of its supply chain management and cost reduction capabilities were materially false and misleading at all relevant times.

129.    As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders ratified the selection of BDO as the Company's independent

registered public accounting firm and reelected Defendants Alstead and Ashford to the Board, allowing them to continue to breach their fiduciary duties to the Company.

**The Truth Emerges**

130.    On May 11, 2021, after the close of trading, the Company reported financial results for 2021 Q1. The Company reported lower revenues year-over-year and lower margins as a result of increased steel and shipping costs. In a press release and a Form 8-K filed that day, the Company stated:

> "Revenues for the first quarter of 2021 were in line with our expectations and Adjusted EBITDA was slightly below our expectations as a result of higher than expected logistics costs. Results were lower compared to last year because of the unseasonably high volume of shipments we had in the first quarter of 2020 to customers that were 'safe harboring' tracker systems in connection with the ITC step-down," said Jim Fusaro, Chief Executive Officer of Array Technologies.
>
> ….
>
> "At the same time as we are seeing record demand for solar, our industry is contending with increases in steel and shipping costs that are unprecedented both in their magnitude and rate of change. ***From Q1 2020 to Q1 2021, spot prices of hot rolled coil steel, the primary raw material used in our products, more than doubled and have continued to increase in the second quarter with spot prices up over 10% since April 1st. Steel represents almost half of our cost of goods sold and we do not hold large amounts of steel inventory, so a significant increase in the price of steel over a short period of time can negatively impact our results.***
>
> ***"The continuing increases in both steel and freight costs will impact our margins in the second quarter and potentially in subsequent quarters if prices do not normalize.*** We are taking several actions to mitigate the impact on the balance of the year, including passing through higher commodity and shipping costs to our customers, fixing commodity prices with our suppliers, entering into long-term contracts with freight providers, further diversifying our supply base, and increasing order lead-times to give us more time to procure raw material.
>
> ….
>
> **First Quarter 2021 Financial Results**

Revenues decreased 44% to $245.9 million compared to $437.7 million for the prior-year period, primarily driven by a reduction in the amount of ITC safe harbor related shipments.

Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. ***Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, higher margins on the 2020 safe harbor shipments, higher input costs due to a rapid increase in commodity prices and greater freight costs resulting in part from disruptions caused by the winter storm in Texas as well as port closures and congestion.***

Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity-based compensation due to the transition to being a public company, $2.4 million of one-time costs related to our common stock follow-on offerings, and higher costs associated with being a public company and an increase in headcount to support our product development and international growth initiatives.

Net income was $2.9 million compared to income of $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.

Adjusted EBITDA decreased 69% to $34.5 million, compared to $110.7 million for the prior-year period.

Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year, and adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year

(Emphasis added.)

131.    Array also announced that Defendant Jonna, then a Managing Director at Oaktree Capital Management, L.P., had resigned from the Board of Directors effective May 10, 2021.

132.    During an investor call held on May 11, 2021 at 5pm ET, Defendant Fusaro finally revealed that steel prices had been rising since Q1 of 2020 and that freight costs had been increasing since April 2020:

> ***[O]ur industry is contending with increases in steel and shipping costs that are unprecedented, both in their magnitude and rate of change. From the first quarter of 2020 to the first quarter of 2021, the spot price of hot rolled coil steel,***

***the primary raw material used in our products, has more than doubled.*** Many industry analysts and market participants expected the dramatic increase in the price of steel to be temporary, which was reflected in futures markets that had indicated lower steel prices for the second half of the year throughout most of the first quarter. Based on those expectations, we felt confident in our ability to manage our input costs and maintain our margins. However, steel prices have continued to increase with spot prices of hot rolled coil up more than 10% since April 1st, and futures now indicate higher rather than lower steel prices for the remainder of the year.

Steel represents almost half of our cost of goods sold, and we do not hold large amounts of steel and inventory. So, a significant increase in the price of steel over a short period of time can negatively impact our results.

***Coinciding with the increase in steel prices has been substantial increases in the cost of both, ocean and truck freight. The average cost to ship a container from Asia to the West Coast has increased by more than 145% from April 2020 to April 2021.*** There also remains a significant disruption across several U.S. ports, resulting from the April Suez Canal accident, and the February Texas storm, which has resulted in higher storage and expediting costs that we would not otherwise have had in a normal environment. ***The cost of truck freight has also increased significantly with the average cost per mile in the first quarter of 2021, up more than 30% versus last year, and costs have continued to increase in the second quarter.***

***The continued increases in both steel and freight costs will impact our margins in Q2, and potentially in subsequent quarters, if prices do not normalize.***

(Emphasis added.)

133.   Later in that same investor call, Defendant Patel summarized the financial results for Q1 2021, disclosing that the Company was not able to affirm previously provided financial guidance:

Revenues for the first quarter decreased 44% to $245.9 million, compared to $437.7 million for the prior year period, primarily driven by a reduction in the amounts of ITC safe harbor related shipments that I discussed earlier.

Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. ***Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, somewhat lower ASPs compared to the 2020 safe harbor shipments, higher input costs, due to primarily to higher steel prices and higher freight costs, resulting in part from disruptions caused by the winter storm in Texas, as well as West Coast port closures and congestion.***

Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity-based compensation due to the transition to being a public company, $2.4 million of onetime costs related to our common stock follow-on offerings, higher costs associated with being a public company, and an increase in headcount to support our product development and international growth initiatives.

Net income was $2.9 million compared to $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.

Adjusted EBITDA decreased 69% to $34.5 million compared to $110.7 million for the prior year period. Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year. And adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year.

….

***Turning to our outlook. As [Fusaro] mentioned earlier, given the continuing increases we are seeing in steel and freight costs, as well as our ongoing review of open contracts to assess what costs we will pass on to our customers, we are not able to affirm our previously provided guidance for the full year. Looking ahead to the second quarter, we expect commodity price increases to delay some project starts, which will result in lower revenues and adjusted EBITDA versus the first quarter.***

(Emphasis added.)

134.    When asked by an analyst why Company management decided not to hedge steel using financial hedges, Defendant Patel responded that, "in the past, that has not been our strategy."

135.    On this news, which was released after markets closed, analysts downgraded Array stock. Barclays cut Array from "Overweight" to "Underweight," Piper Sandler lowered its rating of Array to "Neutral" from "Overweight," and Roth Capital downgraded Array to "Neutral" from "Buy." The Company's share priced declined from its May 11 closing price of $24.95 to close May 12 at $13.46, a decrease of $11.49, or approximately 46%.

## DAMAGES TO ARRAY

136.    As a direct and proximate result of the Defendants' misconduct, Array has lost and will continue to lose and expend many millions of dollars.

137.    Such expenditures include, but are not limited to, fees associated with the Securities Class Action filed against the Company, the Individual Defendants, and the controlling members

of the Company's predecessor entity; the costs associated with any internal investigations; and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

138.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to Defendants who breached their fiduciary duties to the Company.

139.    As a direct and proximate result of the Defendants' conduct, Array has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

140.    Plaintiff brings this action derivatively and for the benefit of Array to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of Array, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

141.    Array is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142.    Plaintiff is, and has been at all relevant times, a shareholder of Array. Plaintiff will adequately and fairly represent the interests of Array in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

143.    Plaintiff incorporates by reference and realleges each and every allegation stated

above as if fully set forth herein.

144.    A pre-suit demand on the Board of Array is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, and Lee, (the "Director-Defendants"), and nonparty Jayanthi (Jay) Iyengar (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

145.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

146.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

147.    Additional reasons that demand on Defendant Fusaro is futile follow. Defendant Fusaro has served as the Company's CEO since June 2018, for which he received over $3 million in compensation in both 2019 and 2020. Defendant Fusaro sold as many as 978,798 shares in the IPO, the December 2020 SPO, and the March 2021 SPO, for a total return of as much as $28.6

million. Thus, it was completely contrary to Defendant Fusaro's interest to ensure adequate disclosure of the Company's dimming prospects prior to the liquidation of his shares in the Offerings. As the Company admits, he is a non-independent director. As CEO, Defendant Fusaro was ultimately responsible for all of the false and misleading statements and omissions that were made in the IPO Documents, the December 2020 SPO Documents, and the March 2021 SPO Documents. Defendant Fusaro personally signed the S-1 registration statements associated with the three Offerings. Moreover, Defendant Fusaro is a defendant in the Securities Class Action. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Fusaro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Alstead is futile follow. At all relevant times, Defendant Alstead served as chairman of the Audit Committee. As a trusted Company director and chairman of the Audit Committee, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Alstead personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. Moreover, Defendant Alstead is a defendant in the Securities Class Action. For these reasons, Defendant Alstead breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Ashford is futile follow. At all relevant times, Defendant Ashford served on both the Audit Committee and the Compensation Committee, serving as chairman of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ashford personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. Moreover, Defendant Ashford is a defendant in the Securities Class Action. For these reasons, Defendant Ashford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Cannova is futile follow. Defendant Cannova is a Vice President at Oaktree Capital Management, L.P., where he is responsible for overseeing investments in energy companies such as Array. Oaktree Capital Management, L.P. is the investment manager of the various Oaktree entities that control ATI Investment Parent, the parent company of Array's predecessor, ATI Intermediate Holdings, LLC. As a Vice President at Oaktree, he owes duties to Oaktree investors and managers to maximize the returns of investments undertaken by Oaktree. Thus, Defendant Cannova's duty to ensure proper disclosure as a Director at Array conflicted with his duty to maximize returns as a Vice President at Oaktree. As the Company admits, he is a non-independent director. Defendant Cannova served for part of the Relevant Period as a member of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Cannova personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. Moreover, Defendant Cannova is a defendant in the Securities Class Action. For these reasons, Defendant Cannova breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Corio is futile follow. Defendant Corio founded Array Technologies in 1989. He served as Chief Executive Officer and Chief Technical Officer of the Company from January 1989 to June 2018 and Chief Innovation Officer of the Company from June 2018 to January 2019. In addition, he served for a portion of the Relevant Period as a member of the Nominating and Corporate Governance Committee. Defendant Corio sold as many as 45,493,187 shares in the IPO, the December 2020 SPO, and the March 2021 SPO, for a total return of as much as $1,219,153,670. With $1.2 billion dollars at stake in the Offerings, it was complete contrary to Defendant Corio's interest to ensure adequate disclosure of the Company's dimming prospects prior to the liquidation of his shares in the Offerings. As the Company admits, he is a non-independent director. Defendant Corio personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. Moreover, Defendant Corio is a defendant in the Securities Class Action. As a trusted director having a long history with the Company, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Corio breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Forth is futile follow. Defendant Forth serves as Chairman of the Board of Directors and previously served as the Company's chief executive officer. Defendant Forth is also a Senior Advisor to Oaktree's GFI Energy Group. Prior to assuming a position as a senior advisor, he was a Managing Director at Oaktree from 2009 to 2016. Through sales of as many as 2,529,248 shares during the Offerings, Defendant Forth garnered as much as $70,935,354. As a Senior Advisor at Oaktree, he owes duties to Oaktree investors and managers to maximize the returns of investments undertaken by Oaktree. Defendant Forth's duty to ensure proper disclosure as a Director at Array conflicted with his duty to maximize returns as a Senior Advisor at Oaktree. Thus, it was completely contrary to Defendant Forth's interest to ensure adequate disclosure of the Company's dimming prospects prior to the liquidation of his shares and the shares of Oaktree investors in the Offerings. As the Company admits, he is a non-independent director. During all of the Relevant Period, he served on both the Nominating and Corporate Governance Committee and the Compensation Committee. However, during his service on those committees and as the Chairman of the Board of Directors, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Forth personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. Moreover, Defendant Forth is a defendant in the Securities Class Action. For these reasons, Defendant Forth breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Lee is futile follow. While Defendant Lee has served as a Director at Array since June 2018, he has worked at Oaktree since 2009. At Oaktree, Defendant Lee is a Managing Director and Co-portfolio Manager. In that position, he is responsible for the overall management of the group and its investing activities. Oaktree Capital Management, L.P. is the investment manager of the various Oaktree entities that control ATI Investment Parent, the parent company of Array's predecessor, ATI Intermediate Holdings, LLC. As a Vice President at Oaktree, Defendant Lee owes duties to Oaktree investors and managers to maximize the returns of investments undertaken by Oaktree. Thus, Defendant Lee's duty to ensure proper disclosure as a Director at Array conflicted with his duty to maximize returns as a Managing Director and Co-portfolio Manager at Oaktree. Defendant Lee also serves as a member of the Audit Committee. As the Company admits, he is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Lee personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. Moreover, Defendant Lee is a defendant in the Securities Class Action. For these reasons, Defendant Lee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on the Board is futile follow.

155.    The Director-Defendants have longstanding business and personal relationships with each other and the Company that preclude them from acting independently and in the best interests of the Company and the shareholders. Three of the Director-Defendants, Chairman Forth and Directors Cannova and Lee, are presently affiliated with Oaktree, which controls entities with substantial control of Array that sold tens of millions of shares in connection with the Offerings. Director-Defendant Forth was paid $0.2 million for consulting work in support of the transition that brought Defendant Fusaro into his position as CEO, making it unlikely that either Forth or Fusaro would take action against one another. Similarly, Defendant Fusaro sold hundreds of thousands of shares in the Offerings and Defendant Corio sold over one hundred million, so it is exceedingly unlikely that either would pursue investigatory or enforcement action against the other for false and misleading statements and the failure to make adequate disclosures in connection with the Offerings, which were very lucrative for the two men. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

156.    Defendants Alstead and Ashford served as members of the Audit Committee throughout the Relevant Period, and Defendant Lee replaced Defendant Cannova as the third member of the Audit Committee during the Relevant Period (together, the "Audit Committee Defendants"). Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the establishment of satisfactory disclosure controls and internal control over financial reporting, as well as the Company's compliance with laws and regulations. The Audit Committee Defendants failed to ensure that satisfactory disclosure controls were in place, and they failed to ensure compliance with laws and

regulations as they are charged to do under the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

157.   The Corporate Governance Guidelines state that it is the Board's responsibility "[t]o ensure that Company management maintains an effective system for timely reporting to the Board or appropriate Board committees and to the public … significant accounting, regulatory, competitive, litigation ***and other external issues affecting the Company***." (Emphasis added.) Additionally, the Corporate Governance Guidelines state that it is the responsibility of the members of the Board "[t]o disclose promptly to the Board any existing or proposed relationships with the Company (other than service as a Board member or on Board committees) which could be required to be disclosed or could affect the independence of the director under applicable listing standards." However, the Board failed to ensure that management maintained an effective system for reporting significant external issues affecting the Company, most notably increasing steel and freight costs. Thus, the Director-Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

158.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of

Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

159.    Array has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors, including non-party Director Iyengal, have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Array any part of the damages Array suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

160.    The Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As nearly all of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

161.    The acts complained of herein constitute violations of fiduciary duties owed by Array's officers and directors, and these acts are incapable of ratification.

162.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Array. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the

"insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Array, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

163.    If there is no directors' and officers' liability insurance, then the Directors will not cause Array to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

164.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth,**

**Jonna, and Lee for violations of Section 14(a) of the Exchange Act**

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

167.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

168.    The 2021 Proxy Statement was materially misleading because it failed to disclose, *inter alia*, that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Board committees' responsibilities, the Board and its committees, and in particular the Audit Committee, were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements, and thus Director-Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee were breaching their fiduciary duties.

169.    Under the direction and watch of Director-Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee, the 2021 Proxy Statement also failed to disclose, *inter alia*: (1) steel prices had been rising significantly since Q1 of 2020; (2) both ocean and truck freight costs had starkly increased since April 2020; (3) the Company failed to maintain adequate internal controls related to disclosures; and (4) the Company's margins and prospects were rapidly declining. As a result, the 2021 Proxy Statement was materially false and misleading.

170.    In the exercise of reasonable care, Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially

false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of Defendants Alstead and Ashford and the ratification of the selection of BDO USA, LLP as the independent registered public accounting firm for the Company for the fiscal year ended December 31, 2021.

171.    The false and misleading elements of the 2021 Proxy Statement led to, among other things, the election of the Defendants Alstead and Ashford, which allowed them to continue to breach their fiduciary duties to the Company.

172.    The Company was damaged as a result of the Defendants Fusaro's, Alstead's, Ashford's, Cannova's, Corio's, Forth's, Jonna's, and Lee's material misrepresentations and omissions in the 2021 Proxy Statement.

173.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CLAIM

### Against the Defendants for Breach of Fiduciary Duties

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    Each Defendant, including the Oaktree Defendants, as co-controlling shareholders, owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Array's business and affairs.

176.    Each of the Individual Defendants and controlling shareholders violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

177.    The Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Array.

178.    In breach of their fiduciary duties owed to Array, the Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) steel prices had been rising significantly since Q1 of 2020; (2) both ocean and truck freight costs had starkly increased since April 2020; (3) the Company failed to maintain adequate internal controls related to disclosures; and (4) the Company's margins and prospects were rapidly declining. As a result of the foregoing, Array's public statements touting positive metrics, giving optimistic guidance, and attesting to the success of its supply chain management and cost reduction capabilities were materially false and misleading at all relevant times.

179.    The Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact. In further breach of their fiduciary duties, the Defendants failed to and/or caused the Company to fail to maintain disclosure controls.

180.    The Oaktree Defendants and at least four of the Individual Defendants—Corio, Forth, Fusaro, and Patel—breached their fiduciary duties by selling shares at artificially inflated prices in the Offerings, which were artificially inflated due to Defendants' misconduct in making and/or causing the Company to make materially false and misleading statements about the Company's costs, margins, and prospects.

181.     The Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Array's securities.

182.     The Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Array's securities. The Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

183.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184.     As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Array has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.     Plaintiff on behalf of Array has no adequate remedy at law.

## THIRD CLAIM

### Against the Defendants for Unjust Enrichment

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Array.

188.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Array that was tied to the performance or artificially inflated valuation of Array, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

189.    The Oaktree Defendants received material financial benefits from the improper conduct and Array's artificially inflated valuation, in the form of increases in goodwill, client retention, fees, and other benefits that were unjust in light of the Defendants' bad faith conduct.

190.    Plaintiff, as a shareholder and a representative of Array, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

191.    Plaintiff on behalf of Array has no adequate remedy at law.

## FOURTH CLAIM

### Against the Defendants for Abuse of Control

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Array, for which they are legally responsible.

194.    As a direct and proximate result of the Defendants' abuse of control, Array has sustained significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

195.    Plaintiff on behalf of Array has no adequate remedy at law.

### FIFTH CLAIM

**Against the Defendants for Gross Mismanagement**

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    By their actions alleged herein, the Defendants, either directly or through aiding and abetting or conspiracy, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Array in a manner consistent with the operations of a publicly-held corporation.

198.    As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, Array has sustained and will continue to sustain significant damages.

199.    As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

200.    Plaintiff on behalf of Array has no adequate remedy at law.

### SIXTH CLAIM

**Against the Defendants for Waste of Corporate Assets**

201.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.    The Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

203.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Defendants have caused Array to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

204.    As a result of the waste of corporate assets, the Defendants are each liable to the Company.

205.    Plaintiff on behalf of Array has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Oaktree Defendants for Aiding and Abetting Breaches of Fiduciary Duty and the Individual Defendants' Other Violations of Law

206.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

207.    The Oaktree Defendants, in addition to having fiduciary duties to the Company by virtue of being co-controlling shareholders in the Company, aided and abetted the Individual Defendants who breached their fiduciary duties to the Company, abused their control, grossly mismanaged the Company, wasted corporate assets, violated the Exchange Act, and were unjustly enriched thereby.

208.    The Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

209.    Specifically, the Oaktree Defendants aided and abetted the Individual Defendants

in making false and misleading statements about the Company's internal controls and the adequacy of the Company's financial statements, allowing the artificial inflation of the price of Company stock for the purpose of enriching insiders, including investors affiliated with the Oaktree Defendants.

210.     The Oaktree Defendants are jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws, including for any unjust enrichment the Oaktree Defendants received from Array while it violated the Exchange Act and aided and abetted the Individual Defendants' aforementioned violations of law.

211.     As a direct and proximate result of the Oaktree Defendants' aiding and abetting of Array's directors' and officers' breaches of duty and other misconduct alleged herein,  Array has sustained and will continue to sustain substantial damages.

212.     Plaintiffs on behalf of Array have no adequate remedy at law.

## EIGHTH CLAIM

**Against Defendants Jim Fusaro, Jipul Patel, Troy Alstead, Orlando D. Ashford, Frank Cannova, Ron P. Corio, Brad Forth, Peter Jonna, Jason Lee, ATI Investment Parent, LLC, Oaktree ATI Investors, L.P., Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P. for Contribution Under Sections 10(b) and 21D of the Exchange Act**

213.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214.     Array Technologies Inc. f/k/a ATI Intermediate Holdings, LLC, Jim Fusaro, Nipul Patel, Troy Alstead, Orlando D. Ashford, Frank Cannova, Ron P. Corio, Brad Forth, Peter Jonna, Jason Lee, ATI Investment Parent, LLC, Oaktree ATI Investors, L.P., Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P. (the "Securities Class Action Defendants") are named as defendants in the Securities Class Action, which asserts

claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers, directors, and/or controlling shareholders of Array.

215.    The Securities Class Action Defendants, because of their positions of control and authority as CEO and CFO of Array, directors, and/or controlling shareholders, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Array, including the wrongful acts complained of herein and in the Securities Class Action.

216.    Accordingly, the Securities Class Action Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

217.    As such, Array is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Array, and that Plaintiff is an adequate representative of Array;

(b)    Declaring that the Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Array;

(c)    Determining and awarding to Array the damages sustained by it as a result

of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Array and the Defendants to take all necessary actions to reform and improve Array's corporate governance and internal procedures to comply with applicable laws and to protect Array and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Array to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Array restitution from the Defendants;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated:  July 16, 2021                                Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I,     Wa Ping Kwan      a          plaintiff in        the        within        action.
I have  reviewed      the     allegations      made      in      this      verified  consolidated
shareholder  derivative    complaint,    know the  contents  thereof,    and  authorize  its  filing.
To    those allegations    of   which   I    have personal knowledge, I  believe  those allegations
to  be  true. As  to  those  allegations  of  which I  do  not have  personal knowledge, I  rely upon
my  counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th
day of _____, 2021.

7/16/2021

_____
Wa Ping Kwan